Bruce G. Paulsen
Kimberly E. White
SEWARD & KISSEL LLP
*Attorneys for Plaintiff*
*Ocean Bulker I LLC*
One Battery Park Plaza
New York, NY 10004

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

OCEAN BULKER I LLC,

                            Plaintiff,        Case No. 09 Civ.6446 (PAC)

      -against-

FLUVIOMAR INTERNATIONAL
LIMITED,

                        Defendant.

**PLAINTIFF OCEAN BULKER I LLC'S OPPOSITION
TO DEFENDANT'S MOTION TO DISMISS**

SEWARD & KISSEL LLP
ONE BATTERY PARK PLAZA
NEW YORK, N.Y. 10004

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ........................................................................................................ ii

PRELIMINARY STATEMENT ................................................................................................. 1

STATEMENT OF THE FACTS ................................................................................................. 2

ARGUMENT ............................................................................................................................... 5

I.      THE TRANSACTION IS MARITIME IN NATURE AND  CHARACTER
BECAUSE IT REFERENCES AND IMPLICATES MARITIME SERVICE AND
TRANSACTIONS AND BEARS A SUBSTANTIAL  RELATIONSHIP TO
MARITIME CONCERNS AND INTERESTS ................................................................. 6

II.     IN THE ALTERNATIVE, CONTRACTS FOR THE PURCHASE  AND SALE
OF A VESSEL ARE MARITIME CONTRACTS ........................................................ 10

CONCLUSION.......................................................................................................................... 14

# TABLE OF AUTHORITIES

## FEDERAL CASES

**Page**

*A. Elephant Corp. v. Hifocus Group Ltd.*, 08 Civ. 9969, 2009 U.S. Dist. LEXIS 19396 (S.D.N.Y. March 10, 2009).................................................................... 13

*The Ada*, 250 F. 194 (2d Cir. 1918) ....................................................... *passim*

*Cary Marine, Inc. v. The PAPILLON*, 872 F. 2d 751 (6th Cir. 1989) ......................................... 12

*Casco Marine Development LLC v. M/V/ Forrestal*, 384 F. Supp. 2d 154 (D. D.C. 2005) ............................................................. 12

*In re Complaint of DFDS Seaways (Bahamas), Ltd.*, 684 F. Supp. 1160 (S.D.N.Y 1987)................................................................. 5

*CTI-Container Leasing Corp. v. Oceanic Operations Corp.*, 682 F. 2d 377 (2d Cir. 1982)..................................................... 12, 13-14

*Derecktor, Inc. v. Norkin*, 820 F. Supp. 791 (S.D.N.Y. 1993) ..................................... 8

*Exxon Corp. v. Cent. Gulf Lines*, 500 U.S. 603 (1991) ......................................... 10, 13

*Flota Maritima Browning de Cuba S.A. v. The CIUDAD DE LA HABANA*, 181 F. Supp. 301 (D. Md. 1960) ............................................. 12

*Flota Maritima Browning de Cuba S.A. v. Snobl*, 363 F. 2d 733 (4th Cir. 1966) ...................... 12

*Folksamerica Reinsurance Co. v. Clean Water of New York*, 413 F.3d 307 (2d Cir. 2007)................................................................ *passim*

*Herman Family Revocable Trust v. The TEDDY BEAR*, 254 F.3d 802 (9th Cir. 2001)............. 12

*International Shipping Co. S.A. v. Hydra Offshore Inc.*, 875 F. 2d 388 (2d Cir. 1989)............. 12

*Jack Neilson, Inc., v. Tug Peggy*, 428 F. 2d 54 (5th Cir. 1970).................................. 12

*Kalafrana Shipping, Ltd. v. Sea Gull Shipping Co.*, 591 F. Supp. 2d 505 (S.D.N.Y. 2008)......................................................... 10, 11

*Magellanes Investment, Inc. v. Circuit Systems, Inc.*, 994 F. 2d 1214 (7th Cir. 1993) ............... 12

*Noble Resources S.A. v. Yugtranzitservis, Ltd.*, 08 CV 3976 (LAP) (S.D.N.Y. July 23, 2008) ....................................................... 10, 11

*Norfolk Southern Railway Co. v. James N. Kirby, Pty. Ltd*, 543 U.S. 14 (2004) .................. *passim*

*North Pacific S.S. Co. v. Hall Brothers Maritime Ry. & Shipbuilding Co.*, 249 U.S. 119 (1919)................................................................. 5

*Orbis Marine Enters. v. TEX Marine Lines, Ltd.*, 692 F. Supp. 280 (S.D.N.Y. 1988)................ 14

*Sea Transp. Contrs., Ltd. v. Indus. Chemiques Du Sengal*, 411 F. Supp. 2d 386
(S.D.N.Y. 2006) ............................................................................................ 8

*Sisson v. Ruby*, 497 U.S. 358 (1990) ............................................................. 10

*The Steamer Eclipse*, 135 U.S. 699, 10 S. Ct. 873, 34 L. Ed. 269 (1890) ................ 12

*Twin City Barge & Towing Co. v. Aiple*, 709 F. 2d 507 (8th Cir. 1983) ..................... 12

*Unicorn Bulk Traders Ltd. v. Fortune Maritime Enterprises, Inc.*, 08 Civ. 9710,
2009 U.S. Dist. LEXIS 3576 (S.D.N.Y. Jan. 20, 2009). ................................... 13

*Vrita Marine Co., Ltd. v. Seagulf Trading LLC*, 572 F. Supp. 2d 411 (S.D.N.Y. 2008)............. 13

*Williamson v. Recovery Ltd. P'ship,* 2007 U.S. Dist. LEXIS 4438
(S.D.N.Y. Jan. 16, 2007) ................................................................................... 7

*Williamson v. Recovery Limited Partnership*, 542 F.3d 43 (2d Cir. 2008) .......................... *passim*

## OTHER AUTHORITIES

**Page**

Braxton Williams, *Can the "Dead Ship" Doctrine Ever Remove a Suit Brought in
Personam on a Maritime Contract from Federal Admiralty Jurisdiction?*,
34 Transp. L .J. 415 (2007) .............................................................................. 12

Grant Gilmore and Charles L. Black, Jr., *The Law of Admiralty* (2d Ed. 1975) ................... 12, 14

Note: *Admiralty Jurisdiction and Ship Sale Contracts*, 6 Stan. L. R. 540 (1954)...................... 12

Note: *Admiralty Practice After Unification:  Barnacles on the Procedural Hull*,
81 Yale L. J. 1154 (1972) ............................................................................... 12

Robert J. Gruendel and Angelique M. Crain, *Admiralty Law in the Wake of
Terrorism*, 77 Tul. L. Rev. 1235 (2003) ........................................................ 12

Steven J. Friedel, 1 *Benedict on Admiralty* (7th Ed. 2006 Rel.) § 186 ........................................ 12

SK 25535 0005 1038190

Plaintiff Ocean Bulker I LLC ("Plaintiff" or "Ocean Bulker") respectfully submits this memorandum of law in opposition to the motion by Defendant Fluviomar International Limited ("Defendant" or "Fluviomar") to dismiss Plaintiff's Complaint, dated July 20, 2009, (the "Complaint") for lack of subject matter jurisdiction.

## Preliminary Statement

This action is in connection with the Panamanian-flagged bulk carrier *Amalia Del Bene* (the "Vessel") – a vessel that has been operating at sea since its construction in 1986. Fluviomar is a transportation company operating on the Hidrovia Waterway and river systems in South America. Fluviomar and Ocean Bulker entered into a profitable and lucrative relationship whereby Ocean Bulker, as owner of the Vessel, engaged Fluviomar to use its shipping expertise to manage the Vessel. As part of this relationship, each party granted to the other the option to purchase or sell the Vessel at a specified price. These options were directly connected to various other rights and obligations correlating with the operation of the Vessel in maritime trade and commerce, specifically, *inter alia*, Fluviomar's obligation to manage the day-to-day operation of the Vessel, responsibility to provide crew for the Vessel, and obligation to manage the chartering of the Vessel on behalf of Ocean Bulker. If Fluviomar breached these obligations, Ocean Bulker's right to exercise its option would vest.

The agreements between the parties bound them in a maritime relationship. This relationship involved both the operation of the Vessel and the rights, obligations and relationship of the parties with respect to financial considerations. Also, the agreements governing the relationship between the parties are linked with the maritime industry itself. In fact, it is the 2008 collapse of that industry which gives rise to the current action.

Contrary to Defendant's assertions, the transaction here at issue does not merely involve a contract for the purchase and sale of a vessel. Rather, it involves an overall maritime

transaction that affects a multitude of rights and obligations of the parties in their use of, and interests in, the Vessel and its management afloat.

## Statement of the Facts

On October 4, 2007, Ocean Bulker and Fluviomar entered into a relationship that was to last roughly fifteen months and would involve the management by Defendant of the Vessel and was expected to culminate in the exercise of an option to purchase that Vessel at the end of 2008, according to terms pegged to the status of the shipping market.

At the commencement of this relationship, Plaintiff and Defendant executed an agreement whereby Fluviomar agreed to technically and commercially manage the Vessel on behalf of Ocean Bulker (the "Management Agreement"). Complaint ("*Compl.*"), ¶ 11, Exhibit B. Under the terms of the Management Agreement, Fluviomar was required to, *inter alia*,

> (a) manage and operate the Vessel with due diligence, efficiency and in conformity with sound business practices, including . . . keeping all physical facilities and equipment needed for the effective conduct of its business in good operating condition . . .

> (c) have the responsibility for the supervisory management of the day-to-day operation of the Vessel including crewing the [V]essel . . .;

> (d) make available to the [Plaintiff] its experience and knowledge as to operating methods and advise the [Plaintiff] regarding all phases of operation of the Vessel . . .

> (f) manage the chartering of the Vessel by the [Plaintiff] to third parties . . .;

> (g) maintain the flag, good registration status, and adequate crew for the Vessel . . .

> (m) monitor the location of the Vessel and the entering and exiting of any port. . .

*Comp.* ¶ 11, *Exhibit B*, Sec. 2.2. Defendant was also required to ensure the Vessel was in compliance with various international treaties governing maritime trade and commerce. *Id*.

Contemporaneously with the execution of the Management Agreement, Plaintiff and Defendant executed a Put and Call Option Agreement (the "Option Agreement"). Pursuant to the Option Agreement, Defendant would have the irrevocable right to purchase from the Plaintiff (the "Call Option") and Plaintiff would have the irrevocable right to sell to the Defendant (the "Put Option") the Vessel at an exercise price of US$ 27,686,817.93. *Id.* at ¶¶ 12, 16 and Exhibit C to the Complaint. Ocean Bulker was permitted to exercise the Put Option (i) at any time within thirty days after December 31, 2008, provided that Defendant had not exercised its call option or (ii) upon the occurrence of an Event of Default. Exhibit C to the Complaint, § 3.3.

The Option Agreement extensively references the Management Agreement and refers to its performance throughout the Option Agreement's provisions. For example, the Option Agreement expressly states that the Management Agreement served as consideration for the execution of the Option Agreement. *Id.* at 2 ("Whereas, Fluviomar and Ocean Bulker are entering into a management agreement dated as of the date hereof…pursuant to which Fluviomar has agreed to technically and commercially manage the Vessel on behalf of Ocean Bulker…NOW, THEREFORE in consideration of the foregoing…the parties hereto hereby agree as follows."). Ocean Bulker made certain covenants "until such time as Fluviomar shall have defaulted in any of its obligations hereunder *or under the Management Agreement* and such default shall not have been cured within the applicable cure period." *Id.*, Article IV (emphasis added). The Option Agreement expressly states that it is an Event of Default if:

> Fluviomar shall have defaulted or failed to comply with the due observance or performance of any term, covenant or agreement contained this (sic) Agreement, the Management Agreement or any other material agreement amongst the Parties, and such failure to comply shall continue uncured for fifteen (15) days.

*Id.*, § 7.1(a).  The Option Agreement expresses a clear intent by the parties to make the agreements indivisible and be reflective of the parties' rights and obligations as necessary to achieve the objectives of the overall maritime transaction.

In addition to the numerous references to the Management Agreement, the Option Agreement contains additional provisions that are uniquely maritime.  The Option Agreement speaks of Ocean Bulker's delivery of the Vessel to Defendant, subject to charter.  *Id.*, § 3.3(b).  Exhibit A to the Option Agreement describes in detail the Vessel's physical characteristics and states that "All engines, machinery, boats, boilers, masts, rigging, anchors, chains, cables, apparel, tackle, outfit, spare gear, fuel, consumable or other stores, freights, belongings and appurtenances, whether on board or ashore relating to the Vessel as of the date hereof are transferred with the Vessel."  *Id.* at 12.  From any angle, the documents reference maritime service and transactions.

In 2008, the shipping market rapidly deteriorated, as evidenced by the sharp decline in worldwide shipping charter rates, and a corresponding drop in the value of vessels.  *Compl.* at ¶ 19.  As such, the value of the Vessel likewise decreased.  *Compl.* ¶ 20.  Defendant's Call Option expired on December 31, 2008 without Defendant exercising that right.  *Compl.* ¶13.  On January 2, 2009, Plaintiff notified Defendant of its intention to exercise its Put Option pursuant to the Option Agreement.  *Compl.* ¶ 21.  Defendant, however, refused to honor its contractual obligation.  *Compl.* ¶ 27.  This failure was not cured within fifteen days and, thus, amounts to an Event of Default under the Option Agreement.  *Compl.* ¶ 18, Exhibit C to the Complaint, § 7.1(a).  Ocean Bulker has made numerous requests to Defendant to perform under the Option Agreement but Defendant has refused to comply.  *Compl.* ¶ 22.

## ARGUMENT

The United States Supreme Court has implicitly, if not specifically, overruled the *per se* conclusion that a contract for the purchase and sale of a ship is not a maritime contract. *See Norfolk Southern Railway Co. v. James N. Kirby, Pty. Ltd*, 543 U.S. 14 (2004) (describing the matter as "a maritime case about a train wreck.").[1]  The Court explained "[the] boundaries of admiralty jurisdiction [are] conceptual," and whether a contract is maritime "depends upon . . . the nature and character of the contract, and the true criterion is whether it has 'reference to maritime service or maritime transactions. . . .'" *Id.* at 18 (quoting *North Pacific S.S. Co. v. Hall Brothers Maritime Ry. & Shipbuilding Co.*, 249 U.S. 119, 125 (1919)).

The Supreme Court's decision in *Kirby* has caused the Second Circuit to refocus its analysis of "maritime contracts" and now requires courts to undertake a complete analysis, looking beyond the mere label of a contract, to determine whether it references maritime services or transactions.  *See, Williamson v. Recovery Limited Partnership*, 542 F.3d 43 (2d Cir. 2008); *Folksamerica Reinsurance Co. v. Clean Water of New York*, 413 F.3d 307 (2d Cir. 2007).  The Second Circuit, in *Folksamerica*, expressly confirmed that the Supreme Court's "recent pronouncement of [*Kirby*] calls for reconsideration of our precedent." *Folksamerica*, 413 F.3d at 314.  Precedent may be overruled or reversed either explicitly or implicitly.  *See e.g.*, *In re Complaint of DFDS Seaways (Bahamas), Ltd.*, 684 F. Supp. 1160, 1162 (S.D.N.Y 1987) (finding

---

[1]  Defendant has cited *The Ada*, 250 F. 194 (2d Cir. 1918) as the hallmark of the Second Circuit's precedent that contracts for the purchase and sale of a ship are not maritime and therefore not subject to the Court's admiralty jurisdiction.  Contrary to Defendant's assertion, however, the central holding of *The Ada* did not analyze the nature of a ship sales contract.  Indeed, the court in *The Ada* merely stated that the purchase portion of a lease-purchase agreement was not maritime, but without citation to precedent or articulating any analysis for its decision.  Instead, the court's analysis focused on "mixed contracts" and established that "a contract enforceable in admiralty must be wholly maritime." *Id.* at 196.  As more fully stated herein, the holding in *The Ada* has effectively been overruled.  *See infra* at 6-13.

the U.S. Supreme Court had "implicitly overruled lower court decisions holding that state law cannot be used to supplement the general maritime law.").

Recent precedent has ushered in a new era in maritime law and the case at bar falls squarely within the jurisdictional guidelines redefined by the Supreme Court in *Kirby* and the Second Circuit in *Williamson* and *Folksamerica*. Because the transaction at issue references maritime service and transactions and contracts for the purchase and sale of vessels are no longer *per se* excluded from maritime jurisdiction, Defendant's Motion to Dismiss should be denied in its entirety.

## I.

### THE TRANSACTION IS MARITIME IN NATURE AND CHARACTER BECAUSE IT REFERENCES AND IMPLICATES MARITIME SERVICE AND TRANSACTIONS AND BEARS A SUBSTANTIAL RELATIONSHIP TO MARITIME CONCERNS AND INTERESTS

Since the Supreme Court's decision in *Kirby*, the Second Circuit has demonstrated that the holding stands for the proposition that contracts which traditionally had not been held to be "maritime contracts," became so because they referenced maritime services and transactions. *Folksamerica*, 413 F.3d at 312; *Williamson*, 542 F.3d at 48. In *Folksamerica*, the Court found that an ordinary comprehensive general liability policy with some marine aspects was within the Court's admiralty jurisdiction because its principal object was maritime commerce. The Court wrote that the standard for determining whether a contract is maritime is to look to its "nature and character" and see if it has "reference to maritime service or maritime transactions." *Folksamerica*, 413 F.3d. at 312. A year later, in *Williamson*, the Second Circuit further clarified the framework for analyzing maritime contracts and, importantly, found that even though the contracts at issue in that case were "just standard non-compete, nondisclosure,

and lease contract agreements," that did not preclude them from being maritime contracts. *Williamson*, 542 F.3d at 49.

Following *Folksamerica*, the Second Circuit in *Williamson* articulated the Supreme Court's holding in *Kirby* as "[amending] our jurisprudence on maritime contracts, recognizing that the proper inquiry is 'whether the principle objective of a contract is maritime commerce. . .'" *Williamson*, 542 F.3d at 48 (quoting *Folksamerica*, 413 F.3d at 315). Further, the Second Circuit clearly enunciated the analysis for determining maritime contracts: "We must 'focus [] our inquiry on whether the principle objective of a contract is maritime commerce . . . and we must look to the 'nature and character of the contract.'" *Id.* at 49 (quoting *Kirby*, 543 U.S. at 25, 24).

In addressing the otherwise standard contracts at issue in *Williamson*, the Second Circuit noted that the contracts were maritime because they "'were by their terms entered into in connection with a maritime commercial venture and are therefore maritime in nature. . . .'" *Williamson*, 542 F.3d at 49 (affirming and quoting the District Court at *Williamson v. Recovery Ltd. P'ship,* 2007 U.S. Dist. LEXIS 4438, at *6 (S.D.N.Y. Jan. 16, 2007)). The agreements at issue in *Williamson* were otherwise standard agreements which defined the rights and obligations of the parties. The Court held that a "just standard" non-compete agreement was a maritime contract because the underlying geographic restriction included "the waters off the shore of the Carolinas." *Id.* at 49. Additionally, the Court held a "just standard" non-disclosure agreement was a maritime contract because the confidential information described work to be performed on a vessel in the Atlantic Ocean. *Id.* In so finding, the Second Circuit focused on the "nature and character" of the agreements. Whereas a standard non-compete or non-disclosure agreement

would not invoke the Court's admiralty jurisdiction, the agreements in *Williamson* did because they were part of a larger "maritime commercial venture" and implicated maritime commerce.

Similarly, the transaction presently at issue is part of a larger maritime venture. Not unlike the agreements in *Williamson*, the transaction at issue, by its very terms, implicates maritime commerce. It operates as a mechanism through which the parties describe their rights and obligations with respect to the operation and management of a vessel plying the sea. It should not, nor was it intended to be, viewed in a vacuum, as Defendants would have this Court do. Rather, like the *Williamson* agreements, the entire venture should be taken into consideration.

Further, there is no question that agency contracts for the management of vessels are maritime in nature. *See Sea Transp. Contrs., Ltd. v. Indus. Chemiques Du Sengal*, 411 F. Supp. 2d 386, 393 (S.D.N.Y. 2006) (a contract whereby one party provides a "shipping management function" was maritime.); *see also, Derecktor, Inc. v. Norkin*, 820 F. Supp. 791, 792-93 (S.D.N.Y. 1993) (it is "clear that admiralty jurisdiction embraces all matters relating to use, support or maintenance of navigable vessels.").

Taken collectively, the transaction in this case is clearly salty and unambiguously maritime in nature.[2] As an initial matter, the Management Agreement clearly falls within this Court's admiralty jurisdiction. *Id*. The operation and management of a vessel, while at sea, is obviously maritime in nature. Therefore, a contract or agreement that governs the operation and management of that vessel at sea is a maritime contract.

---

[2] This argument is not predicated on "overturning" any prior decisions, rather it is based on accepting that the Second Circuit's interpretation of recent Supreme Court decisions in this area expressly allow for *any* type of contract to be deemed a maritime contract if it invokes maritime commerce and maritime transactions.

Moreover, the Option Agreement specifically and repeatedly references the Management Agreement. The Option Agreement was entered into simultaneously with the Management Agreement to create a relationship between the parties dedicated to the operation of the Vessel in maritime trade and commerce. Contrary to Defendants characterizations, the Option Agreement is not merely a contract for the purchase and sale of the Vessel. Rather it operates as a method for either party to enforce their rights under the Management Agreement. Indeed, the Management Agreement formed the basis of consideration for the Option Agreement and Ocean Bulker's right to exercise its Put Option would automatically vest if Fluviomar breached its obligations under the Management Agreement. *Compl.* ¶ 12, Exhibit C, pg. 2.

The parties' option rights are intrinsically connected with the performance of Fluviomar under the Management Agreement and, importantly, are directly impacted by the cycles in the maritime industry. In entering into the Option Agreement, the parties recognized that because the Plaintiff would be able to exercise a put or the Defendant would be able to exercise a call, either of the parties would be able to take advantage of the prevailing state of the maritime industry to either force a purchase or sale of the Vessel. Far from a typical purchase and sale agreement, the Option Agreement lacked any definite obligation to either purchase or sell the Vessel. If the value of the Vessel increased, it would have benefited Fluviomar to exercise its call option to take advantage of the upturn in the maritime industry. If the value of the Vessel decreased, which it did in response to the collapse of the shipping industry, it would be in Ocean Bulker's interest to exercise its put option. In this manner, the decision to exercise one's option would obviously and intrinsically be tied to the current state of the maritime industry.

## II.

### IN THE ALTERNATIVE, CONTRACTS FOR THE PURCHASE AND SALE OF A VESSEL ARE MARITIME CONTRACTS

Alternatively, the Option Agreement stands on its own as a maritime contract. In the wake of *Kirby* and *Folksamerica*, courts in the Southern District of New York have recognized the effect of these holdings on the former rule that contracts for the purchase of a vessel were not maritime in nature. *See Kalafrana Shipping, Ltd. v. Sea Gull Shipping Co.*, 591 F. Supp. 2d 505 (S.D.N.Y. 2008); *Noble Resources v. Yugtranzitservis*, 08 CV 3976 (LAP) (S.D.N.Y. July 23, 2008) (transcript of oral argument annexed hereto). *Kirby* and *Folksamerica* have forced the courts to reconsider *per se* rules which led courts to exclude certain types of contracts from maritime jurisdiction, which invariably led to inconsistent application of maritime doctrine. *See, e.g., Sisson v. Ruby*, 497 U.S. 358, 372 (1990) ("The impossibility of drawing a principled line with respect to what, in addition to the fact that the contract relates to a vessel (which is by nature maritime) is needed in order to make the contract itself 'maritime,' has brought ridicule upon the enterprise.") (concurring opinion); *see also, Exxon Corp. v. Cent. Gulf Lines,* 500 U.S. 603 (1991).

In *Kalafrana*, the court explicitly held that a contract for the purchase and sale of a vessel is a maritime contract, and based on the "broad language" of *Kirby* and *Folksamerica*, such contracts fall within the Court's admiralty jurisdiction. *Kalafrana*, 591 F. Supp. 2d at 509. In *Kalafrana*, Judge Scheindlin noted that a contract for the purchase and sale "of a launched ship that has been plying the seas for some time" has "a distinctly 'salty flavor,' for the sole purpose of a ship is to sail." *Id.*; *see also Folksamerica*, 413 F.3d at 323 ("There are few objects – perhaps none – more essentially related to maritime commerce than vessels.") Moreover, Judge Schiendlin noted that maritime commerce "requires a vessel, sailors, and ship fuel, and

there is simply no justification for including contracts for the latter two requirements in admiralty jurisdiction while excluding contracts for the former." *Kalafrana*, 591 F. Supp. 2d at 509.

Not unlike the vessel in *Kalafrana*, the *Amalia Del Bene* is an operating vessel which has been at sea for twenty-three years and the contract, itself, will be performed at sea. Moreover, the Option Agreement at issue concerning the *Amalia Del Bene* is part of a larger relationship between the Plaintiff and Defendant than the simple purchase and sale agreement implicated by *Kalafrana*. This case is exactly the type of case contemplated by Judge Schiendlin as having a "distinctly salty flavor" as it deals not only with provisions for the purchase and sale of an already launched vessel which will continue to carry cargo, but *also* with various obligations to operate and manage the Vessel as it continues to carry cargo.

In addition, in *Noble Resources*, the court upheld maritime jurisdiction over a commodity sales contract, citing to the Court's holding in *Folksamerica* and the proposition that the threshold inquiry examines the subject matter in dispute rather than the underlying contract. Pointing to the underlying contract's reference to terms for the delivery of the vessel and the vessel's physical characteristics, the court held that the contract involved the business of maritime commerce. Akin to *Noble Resources*, the Option Agreement at issue here implicates the Management Agreement, which is clearly maritime in nature. *See supra* at 3-5; Exhibit C to the Complaint. The Option Agreement speaks of Ocean Bulker's delivery of the Vessel to Defendant, subject to charter. Exhibit C to the Complaint, § 3.3(b). Exhibit A to the Option Agreement describes in detail the Vessel's physical characteristics and states that "All engines, machinery, boats, boilers, masts, rigging, anchors, chains, cables, apparel, tackle, outfit, spare gear, fuel, consumable or other stores, freights, belongings and appurtenances, whether on board or ashore relating to the Vessel as of the date hereof are transferred with the Vessel." *Id*. at 12.

These features all involve maritime concerns, comparable to those the court in *Noble Resources* found sufficient for maritime jurisdiction.

On the other hand, the majority of the authorities cited by Defendant for the contrary proposition were decided before the decisions in *Kirby* (decided November 9, 2004), *Folksamerica* (decided June 20, 2005) and/or *Williamson* (decided August 22, 2008). *See* Defendant's Motion to Dismiss at 1-3 (citing *The Steamer Eclipse*, 135 U.S. 699, 10 S. Ct. 873, 34 L. Ed. 269 (1890); *The Ada*, 250 F. at 194; *International Shipping Co. S.A. v. Hydra Offshore Inc.*, 875 F. 2d 388 (2d Cir. 1989); *CTI-Container Leasing Corp. v. Oceanic Operations Corp.*, 682 F. 2d 377 (2d Cir. 1982); *Herman Family Revocable Trust v. The TEDDY BEAR*, 254 F.3d 802 (9th Cir. 2001); *Magellanes Investment, Inc. v. Circuit Systems, Inc.*, 994 F. 2d 1214 (7th Cir. 1993); *Cary Marine, Inc. v. The PAPILLON*, 872 F. 2d 751 (6th Cir. 1989); *Twin City Barge & Towing Co. v. Aiple*, 709 F. 2d 507 (8th Cir. 1983); *Jack Neilson, Inc., v. Tug Peggy*, 428 F. 2d 54 (5th Cir. 1970); *Flota Maritima Browning de Cuba S.A. v. Snobl*, 363 F. 2d 733 (4th Cir. 1966); *Casco Marine Development LLC v. M/V/ Forrestal*, 384 F. Supp. 2d 154 (D. D.C. 2005); Braxton Williams, *Can the "Dead Ship" Doctrine Ever Remove a Suit Brought in Personam on a Maritime Contract from Federal Admiralty Jurisdiction?*, 34 Transp. L .J. 415 (2007); Note: *Admiralty Practice After Unification: Barnacles on the Procedural Hull*, 81 Yale L. J. 1154, 1160 (1972); *Flota Maritima Browning de Cuba S.A. v. The CIUDAD DE LA HABANA*, 181 F. Supp. 301 (D. Md. 1960); Steven J. Friedel, 1 *Benedict on Admiralty* (7th Ed. 2006 Rel.) § 186; Grant Gilmore and Charles L. Black, Jr., *The Law of Admiralty* (2d Ed. 1975); Robert J. Gruendel and Angelique M. Crain, *Admiralty Law in the Wake of Terrorism*, 77 Tul. L. Rev. 1235 (2003); Note: *Admiralty Jurisdiction and Ship Sale Contracts*, 6 Stan. L. R. 540 (1954)).

*Kirby*, *Folksamerica* and *Williamson* have changed the landscape of maritime jurisdiction and, thus, Defendant's cases to the contrary are inapposite.

Of those cases decided since *Kirby*, *Folksamerica* and/or *Williamson*, Defendant cites to Southern District of New York cases that are distinguishable from the case at bar. *A. Elephant Corp. v. Hifocus Group Ltd.*, for example, involved the purchase of a vessel "sold for demolition only." 08 Civ. 9969, 2009 U.S. Dist. LEXIS 19396 at *9 (S.D.N.Y. March 10, 2009) (acknowledging "incongruous results" stemming from *The Ada* when contracts for sale of parts, equipment considered maritime while contract for a sale of a vessel is not). "A contract for the sale of a vessel that is to be beached and demolished does not have maritime commerce as its 'primary objective.'" *Id.* In the present case, however, the contract would enable the continued sailing of a vessel already at sea for some time. In *Unicorn Bulk Traders Ltd. v. Fortune Maritime Enterprises, Inc.*, there were no allegations in the complaint concerning the past or anticipated use of the vessel at issue and the transaction at issue involved solely the sale of a vessel. 08 Civ. 9710, 2009 U.S. Dist. LEXIS 3576 (S.D.N.Y. Jan. 20, 2009). In *Vrita Marine Co., Ltd. v. Seagulf Trading LLC*, the court relied on pre-*Kirby* and *Williamson* authority and the decision is currently on appeal to the Second Circuit. 572 F. Supp. 2d 411 (S.D.N.Y. 2008).

*Kalafrana* correctly implements the holdings in *Kirby*, *Folksamerica* and *Williamson* and reconciles the heretofore incongruous rules that have resulted from *The Ada* – whereby a contract for the sale of a vessel was not considered a maritime contract, but a contract to charter a vessel was; whereby, a contract to repair a vessel was a maritime contract, but a contract to construct a vessel was not; whereby the contracts for the sale of ship fuel, parts and equipment were considered maritime while the contract for a sale of a vessel was not. *See Exxon,* 500 U.S. at 613, 111 S. Ct. 16 2077, 114 L. Ed. 2d at 659; *CTI-Container Leasing*, 682 F.

2d at 380-81; *Orbis Marine Enters. v. TEX Marine Lines, Ltd.*, 692 F. Supp. 280 (S.D.N.Y. 1988); Grant Gilmore & Charles L. Black, Jr., *The Law of Admiralty* 26 (2d ed. 1975). *Kalafrana* recognizes that the Supreme Court and Second Circuit have implicitly overruled *The Ada* and changed the landscape of admiralty jurisdictional law.

The transaction in this matter is maritime, involves maritime services and transactions, implicates concerns regarding maritime commerce and entitles the parties to invoke the maritime jurisdiction of this Court. With the powers of the court's jurisdictional powers redefined in light of recent jurisprudence, Ocean Bulker's claim is properly considered maritime. As such, Defendant's Motion to Dismiss for lack of subject matter jurisdiction should be denied.

## CONCLUSION

For the foregoing reasons, this Court may properly exercise admiralty jurisdiction over the case at bar and Defendant's Motion to Dismiss should be denied in its entirety.

Respectfully submitted,

/s Bruce G. Paulsen
Bruce G. Paulsen (BP-9563)
Kimberly E. White (KW-0141)
SEWARD & KISSEL LLP
One Battery Park Plaza
New York, New York 10004
(212) 574-1533
*Attorneys for Plaintiff Ocean Bulker I LLC*

SK 25535 0005 1033771

# APPENDIX

87N6NOBL
1  UNITED STATES DISTRICT COURT
1  SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x
2
3
3  NOBLE RESOURCES,
4
4                Plaintiff,
5
5        v.                                08 CV 3876(LAP)
5
6  YUGTRANZITSERVIS and
6  SILVERSTONE,
7
7                Defendants.
8
8  ------------------------------x
9                                          New York, N.Y.
9                                          July 23, 2008
10                                         9:45 a.m.
10
11 Before:
11
12                   HON. LORETTA A. PRESKA,
12
13                                          District Judge
13
14                           APPEARANCES
14
15 TISDALE LAW OFFICES, LLC
15      Attorneys for Plaintiff
16 BY:  CLAURISSE OROZCO
16
17 CHALOS & CO.
17      Attorneys for Defendants
18 BY:  GEORGE M. CHALOS
18
19
20
21
22
23
24
25

                   SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

                                                              2

87N6NOBL
1              (Case called; in open court)
2
3              THE COURT:  Counsel have very graciously agreed to
4  prepare their papers quickly so that the hearing required to be
5  conducted quickly on a motion to vacate a maritime attachment
6  could take place promptly.  I am grateful to counsel for doing
7  that.
8              Defendant argues first that the contract at issue is
9  not subject to maritime jurisdiction.  We all agree to the law
10 which is that the threshold inquiry examines the subject matter
11 of dispute as opposed to the underlying contract.  To determine
12 if an issue related to maritime interests has been raised, an
13 issue will not give rise to maritime jurisdiction if the
14 subject matter of the dispute is so attenuated from the
                              Page 1

Transcript (07 23 08).txt

15    business of maritime commerce that it does not implicate the
16    concerns underlying admiralty and maritime jurisdiction.
17             As the Court of Appeals acknowledged in FolksAmerica,
18    Reinsurance Co. v. Cleanwater New York, Inc., 413 F.3d 307 (2d
19    Cir. 2005) the court directed that the jurisdictional inquiry
20    be focused upon whether the nature of the transaction was
21    maritime and observed that the fundamental interest giving rise
22    to maritime jurisdiction is the protection of maritime
23    commerce.
24             Here, the contract itself makes clear that maritime
25    transportation was integral to the agreement.  For example, the
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

                                                                    3

      87N6NOBL
1     contract provided that Plaintiff Noble would purchase a cargo
2     from YTS and the contract set out in great detail the
3     conditions for transportation and delivery.
4              The contract set out in the portion under delivery the
5     window of dates open for loading in the specified port, that
6     portion of the contract also required that the vessel nominated
7     by buyers was required to tender her notice of readiness at the
8     designated port.  It set out how the loading of the vessel was
9     to be effected.  It set out in great detail the type of vessel
10    that would be acceptable, that is, "A self-trimming bulk
11    carrier, single-decker vessel suitable for direct loading
12    (wagon-board of the vessel)."
13             The Contract also provided that the vessel could be --
14    should be confirmed or rejected by sellers in writing and, in
15    fact, here the sellers rejected the first three vessels that
16    were nominated eventually accepting the Southgate.
17             The contract further set out the preadvise that buyers
18    were to give the sellers of the vessel's ETA, name, flag,
19    dimensions, hatches and hold dimensions and alike.  It set out
20    in detail the loading instructions, the loading rate, detailed
21    the notice of readiness and the laytime and the demurrage,
22    among other provisions.  So the underlying contract certainly
23    touched upon the business of maritime commerce.
24             In addition, the dispute between the parties also
25    touches upon the maritime commerce.  As set out in plaintiff's
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

                                                                    4

      87N6NOBL
1     claim submissions in the arbitration, and perhaps more
2     importantly as reflected in the award, the dispute centered on
3     two issues.  First, the default by YTS in failing to provide a
4     berth for the vessel after she had tendered her notice of
5     readiness and refusal to load the vessel constituting a default
6     under the contract.  And, secondly, a request for wasted vessel
7     costs, that is, the costs incurred by the vessel following
8     tendering of her notice of readiness.
9              As set out in the award damages were awarded for both
10    these items and indeed there was a lengthy discussion in
11    Section 6 of the award about the wasted costs incurred on
12    account of the vessel's lack of use because of defendant YTS's
13    default.  The wasted vessel expenses included bunkering costs,
14    port and survey costs, and hire payments, all clearly within
15    the maritime jurisdiction.
16             For all those reasons, I find that the contract and
17    dispute at issue fall within the Court's maritime jurisdiction.
18             The question has also been presented as to whether or
19    not the guarantee by Silverstone falls within the Court's
                                Page 2

Transcript (07 23 08).txt
```
20    maritime jurisdiction.  As the Court has set out recently in C
21    Transport Panamax, Ltd. V. Kremikovtzi Trade, et al., 07 CR 893
22    (June 19, 2008 S.D.N.Y.) courts in this circuit and elsewhere
23    have long held that an agreement to act as a surety on a
24    maritime contract is not maritime in nature.  They have
25    recognized that the same is not true of an agreement to
```

                                                                  5

```
      87N6NOBL
 1    guarantee the performance of a maritime contract.
 2            See e.g. Compagnie Francaise, DE Navigational Avapeur
 3    v. Bonnase, 19 F.2d 777, 779 (2d Cir. 1927) (L. Hand, J).
 4            Here the guarantee by Silverstone specifically states
 5    "The guarantor (Silverstone) irrevocably and unconditionally,
 6    A, as principal obligor guarantees to the Buyers the prompt
 7    performance by (YTS) of all its obligations under the
 8    Contract...."  Accordingly, the guarantee at issue here based
 9    on longstanding Second Circuit law falls within the meaning of
10    maritime contracts.
11            Finally, with respect to defendant's argument that the
12    matter is not ripe, the arbitral award has ordered that the
13    payment be made and it has not yet been paid.  Accordingly, the
14    matter is ripe with respect to the guarantor.  In addition, it
15    is most frequently the case that Rule B attachments are used to
16    provide security for arbitral awards and that has been the use
17    here.  Accordingly, defendants' motion to vacate the attachment
18    is denied.
19            THE COURT:  Is there anything else today?
20            MR. CHALOS:  Yes, your Honor, two points if I may.
21            THE COURT:  Sir.
22            MR. CHALOS:  We thank the Court for hearing us on an
23    expedited basis.  We would first off like to make an
24    application to the Court to reduce the amount of security.  On
25    page 14 of the award, the panel clearly sets forth that the
```

                                                                  6

```
      87N6NOBL
 1    plaintiff was awarded $3,362,400 and no more as the words of
 2    the panel.  Here the amount of the order attachment is almost
 3    double that.  It is significantly more.
 4            THE COURT:  What is the story with the interest,
 5    Mr. Chalos?
 6            MR. CHALOS:  According to the panel, it is 7.5 percent
 7    beginning August 16, 2007.  That is only one year's worth of
 8    interest.  Surely this can be resolved in the next, I would
 9    assume, six months or so with the upcoming appellate deadlines.
10            THE COURT:  Has anyone done the calculation of the
11    interest?
12            MS. OROZCO:  I have, your Honor.  But I would just
13    like to speak on that point.  The panel awards the amount less
14    than we had sought in our application, but it also awards
15    interest 7.5 percent from the date of the default until it is
16    paid and it also awards costs of arbitrator, not legal costs.
17            We have attached to date as outlined in my declaration
18    $4 million.  It is paragraph 34 of my declaration at page 6.
19    We have not calculated the interest out for a year.  What we
20    have done is calculated it out for three years, which is
21    normally what we undertake in anticipating appeals and that
22    sort of thing.  If we allow for three years of interest,
23    security for three years of interest, plus the costs of the
24    Gafta arbitration, the security that we would be entitled to
```
                                 Page 3

25  would be $4,225,000.
           SOUTHERN DISTRICT REPORTERS, P.C.
                   (212) 805-0300

                                                                   7

87N6NOBL
 1          So we are at this time undersecured by 200,000.
 2  However, if the Court wants us to reevaluate the interest, we
 3  would be willing to do so and then release the funds
 4  accordingly if that was a proper analysis.
 5          THE COURT:  Counsel.
 6          MR. CHALOS:  Those calculations are flawed.  Those
 7  calculations are based on the principal claim of 3.9 million.
 8  That is not what the panel awarded.  7.5 percent on the $3.3
 9  million award is about, 21 to $210,000.
10          MS. OROZCO:  I actually calculated the three-year
11  interest on the amount awarded by the arbitrators, which was
12  $3,362,400.  And the interest from August 15th, 2007 through
13  August 15th, 2010 is $840,000.
14          MR. CHALOS:  I submit through 2010 is a bit long.  I
15  can certainly understand maybe two years, but not three.
16          Also, seeing as they are already secured from the
17  guarantor's EFTs, I renew my application and dismiss the matter
18  against YTS.  They are secured or they are not secured.  They
19  have it already attached.  There is no in rem quasi
20  jurisdiction over the party whose funds who haven't been
21  attached.
22          THE COURT:  I don't hear counsel going out and seeking
23  further attachments here.
24          MR. CHALOS:  But they would, though.  That is the
25  point if they sought to move money.  In fact, in the papers
           SOUTHERN DISTRICT REPORTERS, P.C.
                   (212) 805-0300

                                                                   8

87N6NOBL
 1  that counsel submitted last night, they said exactly that they
 2  would do that.  If they wound up -- U.S. dollar transfers on
 3  behalf of Yugtranszitservis came through New York, they would
 4  catch that and release monies belonging to the guarantor.
 5          THE COURT:  What do you say to that, counsel?
 6          MS. OROZCO:  Was that was a statement that we made.
 7  That statement as made with respect to the application of the
 8  New York CPLR in that case, which we didn't address and we say
 9  we are not applied.  We actually have stopped serving the writ
10  of attachment in this case and we are no longing serving on any
11  of the defendants.
12          THE COURT:  First, I decline to reduce the amount.
13          Second, obviously counsel knows that plaintiff may not
14  be oversecured.  If, Mr. Chalos, you find that plaintiff is
15  attaching more than the four million two number -- is that the
16  total number?  Please remind me.
17          MS. OROZCO:  Yes.  The total number is comprised of
18  $3,362,400 of principal pursuant to the arbitration award
19  issued on July 4th, 2008, with the rate of interest calculated
20  at 7.5 percent which is also the rate awarded for three years
21  from August 15th, 2007 through August 15th, 2010.  The interest
22  on that amount is $840,501.
23          In addition, the arbitration award also allowed costs,
24  Gafta costs, to the plaintiff and the Gafta costs incurred were
25  23,000 U.S. dollars.  So the total security we would be
           SOUTHERN DISTRICT REPORTERS, P.C.
                   (212) 805-0300

                                                                   9

87N6NOBL

                          Page 4

Transcript (07 23 08).txt
```
 1  entitled to or we would be seeking is $4,225,901.
 2          THE COURT:  To the extent, Mr. Chalos, counsel
 3  attaches more than that, you let me know.
 4          MR. CHALOS:  Thank you, your Honor.
 5          Finally, your Honor, we would like to ask the Court to
 6  certify this for immediate appeal to the Second Circuit.
 7          THE COURT:  I will take a letter on that.
 8          How is this a complex or novel issue?
 9          MR. CHALOS:  Well, it is a novel issue in the sense
10  that the Court has for the first time found a Gafta contract to
11  be within the meaning of a maritime contract and a maritime
12  claim under Rule B.  It stands starkly in contrast to Judge
13  Daniels' decision as to Aston Agro as well as Judge Sullivan, I
14  am not sure about that, in the Tan Shan case.  These exact
15  arguments were presented there with a 180-degree different
16  result and I do believe that if we can bring this to a head
17  Second Circuit level promptly that would help provide some
18  clarity on these types of issues.
19          THE COURT:  The law is not in doubt.  It is the
20  application, right?
21          MR. CHALOS:  Well, I think the law is in doubt in a
22  sense that our position is that the Court needs to look to the
23  primarily objective of the contract.  Our argument has been
24  that the primary objective of the contract is one of sale and
25  purchase.
                 SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300
```

⬜                                                                        10

87N6NOBL
```
 1          THE COURT:  I didn't see any of the Second Circuit
 2  cases talking about the primary objective of the contract.
 3          MR. CHALOS:  Well, I think we set out the argument
 4  based on the precedent of Judge Daniels' decision, which can be
 5  found for the Court's reference on page 3 of the Aston Agro
 6  decision where he writes, In this case the contracts are not
 7  maritime contracts because they are primary objective was not
 8  the transportation of goods by sea.  Instead, their primary
 9  objective was undoubtedly the sale of wheat.  That the wheat
10  was transported on a ship does not make the contracts maritime
11  contracts anymore than it would make them aviation contracts
12  had the wheat been shipped via airplane.  Nor would the
13  contracts between a seller and shipper -- that is true here.
14  the judge in that matter goes on to write, Nor can maritime
15  jurisdiction be exercised under an exception to the general
16  rule that maritime jurisdiction "Arises only when the subject
17  matter of the contract is purely or wholly maritime in nature.
18  Under the first exception, federal court can exercise --
19          THE COURT:  Counsel, do you want this taken down?  If
20  you do, you better read so the court reporter can take it down.
21          MR. CHALOS:  The Court has it before it.
22          THE COURT:  So you don't need to read it.
23          MS. OROZCO:  May I respond?
24          THE COURT:  Yes, ma'am.
25          MS. OROZCO:  The key to the quotes by defendant from
                 SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300
```

⬜                                                                        11

87N6NOBL
```
 1  the Ashon Agro case is the first line where it says, "In this
 2  case." and further or in the quote Judge Daniels says that
 3  based on the facts of that particular case they are not within
 4  the maritime jurisdiction.
 5          I would just like to point out that the Exxon case,
```
                              Page 5

6   500 U.S. 603, 612 reminds us -- this is the U.S. Supreme
7   Court -- reminds us that courts are required to look to the
8   subject matter of the relevant contract. And in this case the
9   relevant contract, the Noble YTS contract, provides maritime
10  jurisdiction.
11          MR. CHALOS: Your Honor, this is the shifting sands
12  that I have been arguing again. The Court is required to look
13  to the nature of the contract, not the dispute. Twenty minutes
14  ago counsel was arguing the Court needs to look to the dispute
15  and I rejected that. The contract is a sale and purchase
16  contract, not a maritime contract. It is not maritime contract
17  with third parties. We had nothing do with it. My clients had
18  nothing to do with it. That is the dispute here. If you look
19  to the nature and substance of the contract, we are selling and
20  they are buying. Full stop. It is the sale and purchase
21  contract.
22          In fact, your Honor, that was precisely what was
23  addressed by Judge Daniels. He writes here invoking the first
24  exception, Aston contends that maritime jurisdiction exists
25  because the particular claims at issue involve only the
                  SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

                                                              12

87N6NOBL
1   maritime portions of the contracts, and it was rejected, which
2   is precisely the argument presented by plaintiff. Our
3   opposition is precisely the argument adopted by Judge Daniels.
4           THE COURT: The Court denies the request for
5   certification under 28, U.S.C., Section 1292(b). The
6   controlling law is not at all at issue in this case. Everyone
7   agrees on the cases that should be looked to for guidance. The
8   only dispute is the application of those cases to the facts of
9   this case as opposed to the facts of other cases. Accordingly
10  certification for immediate appeal is denied.
11          Anything else, counsel?
12          MR. CHALOS: Nothing further, your Honor.
13          THE COURT: Thank you, ladies and gentlemen. Thank
14  you for your excellent arguments.
15                          o0o
16
17
18
19
20
21
22
23
24
25
                  SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300