BLANK ROME LLP
Attorneys for Defendant
Jack A. Greenbaum (JG-0039)
The Chrysler Building
405 Lexington Avenue
New York, NY 10174
(212) 885-5000
jgreenbaum@blankrome.com

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| OCEAN BULKER I LLC,<br><br>            Plaintiff,<br><br>    -against-<br><br>FLUVIOMAR INTERNATIONAL LIMITED,<br><br>            Defendant. | 09 Civ. 6446 (PAC) |

### DEFENDANT'S REPLY MEMORANDUM ON ITS MOTION TO DISMISS COMPLAINT FOR <u>LACK OF SUBJECT MATTER JURISDICTION</u>

This memorandum is submitted on behalf of Defendant, FLUVIOMAR INTERNATIONAL LIMITED ("Defendant"), in reply to Plaintiff's opposition to Defendant's motion pursuant to F. R. Civ. P. Rule 12(b)(1) to dismiss the Complaint for lack of subject matter jurisdiction.

### <u>ARGUMENT</u>

### POINT I

### THE FORMER EXISTENCE OF A MANAGEMENT AGREEMENT DOES NOT MAKE THE SALE AND PURCHASE OPTION AGREEMENT MARITIME

The Complaint asserts a claim for damages and, alternatively, for specific performance, for Defendant's refusal to honor an alleged obligation to buy a ship pursuant to a Put-and-Call

Option Agreement. (Compl. ¶¶ 2-3 and Ex. C thereto.) The Put Option was Plaintiff's right to sell and require Defendant to buy the ship upon an "Event of Default," or if Defendant did not exercise its Call Option (to buy the ship) by December 31, 2008. (Compl. Ex. C.)

In a tortuous attempt to imbue the Option Agreement with a "salty" flavor, Plaintiff seeks to link this ship sale contract to a ship Management Agreement it contends was maritime. (Pl. Br. at 1, 8-9.) Plaintiff, however, seems to forget that it terminated the Management Agreement on December 21, 2007, more than a year before it allegedly exercised its Put Option. (Ex. A to Greenbaum Reply Decl.) Contrary to Plaintiff's argument that "The parties' option rights are intrinsically connected with the performance of Fluviomar under the Management Agreement" (Br. at 9), there existed no Management Agreement at the time Plaintiff supposedly exercised its Put Option and for more than a year before. In essence, the Complaint alleges that the Option Agreement lived on without the supposedly inextricable Management Agreement.

Plaintiff also ignores the fact that the contracts were explicitly made independent from one another by a "merger" clause in each one. The Option Agreement (Compl. Ex. D) provides:

> Section 8.3. <u>Entire Agreement</u>. This Agreement sets forth the entire understanding and agreement between the parties as to the matters covered herein and supersedes and replace [*sic*] any prior understanding, agreement or statement of intent, in each case, written or oral, of any and every nature with respect thereto.

The "matters covered herein" are Defendant's right to purchase the vessel and Plaintiff's right to require the Defendant to purchase the vessel if certain conditions exist.

The Management Agreement (Compl. Ex. B) provides:

> Section 7.5 **Entire Agreement**. This Agreement contains the entire understanding of the Parties with respect to the matters covered hereby and supersedes any and all other written and oral communications, negotiations, commitments and writings with respect thereto.

2

128920.00602/6798259v.1

The "matters covered hereby" are the parties' rights and obligations with respect to the management of the vessel, which stand separate and apart from the matters covered by the Option Agreement.

In addition to the contractually explicit independence of the two agreements, the practical proof of that independence is the fact that the Option Agreement allegedly continued to exist for more than a year after Plaintiff terminated the Management Agreement.

Plaintiff incorrectly argues that the Option Agreement "operates as a method for either party to enforce their rights under the Management Agreement." (Br. at 9.) There is nothing in either agreement that enables Defendant to enforce its rights under the other agreement. It may be that the Option Agreement would have permitted Plaintiff to exercise its Put Option "upon the occurrence" of an Event of Default (Compl. Ex. C, Art. 3.3(ii)), which was defined to include certain defaults under the Management Agreement (*id.* at Art. 7.1(a)), but that right was waived when Plaintiff terminated the Management Agreement without purporting to exercise its Put Option "upon the occurrence" of any alleged default under the Management Agreement. The Complaint alleges that Defendant did not exercise its Call Option by December 31, 2008. (Compl. ¶ 14.) It does not allege that Plaintiff exercised its Put Option because of any default under the Management Agreement over a year earlier. (Compl. ¶ 21.) Obviously, Plaintiff could not sit on any such alleged right for a year while waiting to see whether the value of the ship went up or down.

3
128920.00602/6798259v.1

## POINT II

## THE OPTION AGREEMENT WAS NOT MARITIME

Despite commencing its second point of argument: "Alternatively, the Option Agreement stands on its own as a maritime contract" (Br. at 10), Plaintiff then goes on to repeat its assertions regarding the long dead Management Agreement. (Br. at 11.)

Plaintiff's attempted conflation notwithstanding, the Option Agreement is fundamentally a purchase and sale agreement. There is no merit in Plaintiff's argument that the Option Agreement is maritime because the ship was to be delivered at sea and the contract contains a physical description of the ship. (Br. at 4, 11.) *Every* non-maritime ship sale contract describes the ship and provides for delivery at sea, with a few exceptions that call for delivery in dry dock.

No decision has overruled the many decisions across the country holding ship sale contracts are not maritime. *Exxon Corp. v. Central Gulf Lines, Inc.*, 500 U.S. 603, 111 S. Ct. 2071, 114 L. Ed. 2d 649 (1991) overruled one specific *per se* rule that formerly held agency agreements are not maritime contracts. The Court was very pointed in warning: "We emphasize that our ruling is a narrow one. We remove only the precedent of *Minturn* [*v. Maynard*, 58 U.S. 477 (1855)] from the body of rules that have developed over what types of contracts are maritime." 500 U.S. at 612.

*Norfolk Southern Railway Co. v. James N. Kirby Pty. Ltd.*, 543 U.S. 14, 125 S. Ct. 385, 160 L. Ed. 2d 283 (2004) involved a *mixed* contract, a through bill of lading that covered both ocean and overland transportation. The Court held: "Conceptually, so long as a bill of lading requires substantial carriage of goods by sea, its purpose is to effectuate maritime commerce— and thus it is a maritime contract." 543 U.S. at 27. The Option Agreement did not involve any sort of commerce afloat.

4

Similarly, *Folksamerica Reinsurance Co. v. Clean Water of New York*, 413 F. 3d 307 (2d Cir. 2005) involved a mixed contract, which insured risks both afloat and ashore. The Court held the principle objective of the contract was maritime, and therefore the contract was maritime.

Plaintiff misapplies its quotation from *Folksamerica* that the *Kirby* holding "calls for reconsideration of our precedent." (Br. at 5.) The Second Circuit expressly referred to its precedent in mixed contract cases. Formerly, in order to fall within the admiralty jurisdiction, the maritime obligations in a mixed contract had to be severable, or the non-maritime obligations had to be incidental. 413 F. 3d at 314. Contrary to Plaintiff's intimation, the Second Circuit did not hold it had to reconsider all its precedents regarding what contracts are or are not maritime. In particular, the Court did not refer to ship sale contracts or to *The ADA*, 250 F. 194 (2d Cir. 1918), which held sale contracts are not maritime. This is still the law in this Circuit until the Court of Appeals holds otherwise.

It is irrelevant whether *The ADA* involved a mixed charter party and ship sale contract, as Plaintiff asserts (Br. at 5, n. 1), or just a loan and sale transaction in the nature of a leveraged lease. *The ADA* nonetheless held the sale obligations were non-maritime. Even if *The ADA* involved a mixed contract, which Plaintiff seems to contend would today be held maritime, that is not at all relevant to the present case. The Option Agreement is *not* a mixed contract. It is purely a purchase and sale contract, which *The ADA* and innumerable other cases hold to be non-maritime.

In *Folksamerica*, the Second Circuit expressed uncertainty whether *Kirby* left intact the Second Circuit's threshold requirement that the claim as such involve a maritime obligation, but went on to hold that the claim in that case met the test. In the present case, the claim is of a clearly non-maritime alleged obligation to purchase a ship, and does not pass the threshold test.

5

*Williamson v. Recovery Limited Partnership*, 542 F. 3d 43 (2d Cir. 2008) affords Plaintiff no assistance. There, the non-compete and non-disclosure agreements were obligations not to compete with or disclose work done *at sea*. The work was a maritime service, so the obligations not to compete or disclose the maritime service were likewise maritime.

*Kalafrana Shipping Ltd. v. Sea Gull Shipping Co.*, 591 F. Supp. 2d 505 (S.D.N.Y. 2008) also involved a mixed contract, involving a maritime obligation to repair the vessel with an obligation to sell the vessel. The claim was for breach of the repair obligation. Therefore, the decision that the mixed contract was maritime had some theoretical support. It is true that Judge Scheindlein purported to hold the sale portion of the contract independently maritime as well. With all due respect to Judge Scheindlein, it simply and plainly was beyond her authority to hold that *The ADA* and its progeny were overruled by cases that neither expressly nor implicitly refer to ship sale contracts.

It would be singularly inappropriate for a District Court to do so now, when there are four appeals on the point pending in the Second Circuit. (In addition to the three cited in Defendant's Memorandum of Law, the fourth appeal is *A. Elephant Corp. v. Hifocus Group Ltd.*, 08 Civ. 9969 (HB), 2009 U.S. Dist. LEXIS 19396 (S.D.N.Y. March 10, 2009), app. no. 09-1261-cv.) However, it is uncertain whether those appeals in Rule B cases will go forward, be withdrawn, or be deferred, in light of the recent decision in – and possible further appeal of -- *SCI v. Jaldhi Overseas Pte. Ltd.*, 2009 U.S. App. LEXIS 263 (2d Cir. Oct. 16, 2009), which held that electronic fund transfers in the hands of intermediary banks may not be attached under Rule B.

Plaintiff's argument that a "majority" of the decisions cited in Defendant's previous Memorandum pre-dated *Kirby* and *Folksamerica* is rather toothless. Plaintiff points to 11 such decisions, from the Supreme Court, through the Circuits, and down to the District level (Br. at

6

128920.00602/6798259v.1

12), but ignores the fact that nine decisions in 2008 and 2009 were cited at pages 3-4 of Plaintiff's Memorandum of Law. Plaintiff seems not to comprehend the clear message that 20 consistent decisions conveys, not to mention countless decisions holding the same way that were not cited.

## CONCLUSION

### THE COMPLAINT SHOULD BE DISMISSED

Dated: October 28, 2009

>Respectfully submitted,
>BLANK ROME LLP
>Attorneys for Defendant
>
>By _____
>Jack A. Greenbaum (JG 0039)
>405 LexingtonAve.
>New York, NY 10174
>Tel.: (212) 885-5000
>jgreenbaum@blankrome.com